IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| TAMORAH CHAPMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CASE NO. 1:11-CV-1016** |
| v. | ) | **(GBL/TRJ)** |
| | ) | |
| TIMOTHY GEITHNER, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on the Motion for Judgment on the Pleadings and

Motion for Summary Judgment by Defendant Timothy Geithner, Secretary of the Treasury of the

United States. In this action, Tamorah Chapman, *pro se*, seeks monetary damages for alleged sex

discrimination and retaliation by her former employer, the United States Department of the

Treasury, in violation of Title VII of the Civil Rights Act of 1964.

There are four issues presented in the Secretary's Motion for Judgment on the Pleadings

and Motion for Summary Judgment. The first issue is whether Chapman's Amended Complaint

contains adequate pleading of Title VII claims based on the actions by management alleged in

Paragraphs 57, 61, 65, 66, 70, 104, and 107. The Court holds that the Amended Complaint fails

to provide sufficient factual support for Title VII claims based on the management actions

alleged in these paragraphs and therefore grants the Secretary's Motion for Judgment on the Pleadings.

The second issue is whether Title VII claims based on the management actions alleged in Paragraphs 79 and 83 should be dismissed for Chapman's failure to exhaust her administrative remedies. The Court holds that Chapman failed to exhaust her administrative remedies and therefore grants the Secretary's Motion for Summary Judgment as to discrimination or retaliation claims based on the actions alleged in Paragraphs 79 and 83.

The third issue is whether there is a genuine factual dispute that Chapman was non-selected for positions to which she applied, formally disciplined, and terminated for legitimate non-discriminatory and non-retaliatory reasons sufficient to preclude summary judgment. The Secretary offers evidence that Chapman was non-selected for lack of qualifications and was disciplined and ultimately terminated for unprofessional conduct in various interactions with her supervisors at the Internal Revenue Service ("IRS"). The legitimate, non-discriminatory and non-retaliatory reasons offered for Chapman's non-selections, the formal disciplinary actions taken against her, and her termination from the IRS are not shown by Chapman to be pretextual, and therefore cannot be reasonably disputed. For this reason, the Court grants the Secretary's Motion for Summary Judgment as to these claims.

The fourth issue is whether Chapman presents *prima facie* cases of sex discrimination or retaliation under Title VII based on her non-selection for vacant positions within the IRS, Chapman's work performance evaluations, travel- and meeting attendance-related requirements placed on Chapman by her supervisors, counseling memoranda issued to Chapman, her reassignment to different supervisors, and other management conduct complained of by Chapman. Chapman fails to set forth *prima facie* cases of sex discrimination or retaliation based

on these management actions and therefore grants the Secretary's Motion for Summary Judgment as to these claims.

## I.      BACKGROUND

Tamorah Chapman's Title VII suit against the Secretary of the Treasury ("Secretary") is based on five Equal Employment Opportunity ("EEO") complaints filed by Chapman between August 2007 and January 2010 and decided by the Department of Treasury ("Department") between March 2010 and September 2010. Together, the five EEO complaints captured over 130 claims of sex discrimination, retaliation, and harassment, the majority of which Chapman now presses before this Court. Chapman asserts numerous bases for her discrimination and retaliation claims. First, she asserts discrimination and/or retaliation based on her termination in August 2009 and prior disciplinary actions taken against her. Second, Chapman alleges that her non-selection for numerous vacant positions within the Internal Revenue Service ("IRS" or "Service") to which she had applied between February 2007 and July 2009 was discriminatory and retaliatory. Third, she alleges discrimination and retaliation in her immediate supervisors' alleged failure to provide accurate performance evaluations and to assign professionally valuable and developmental work to her. Fourth, Chapman asserts that managers' requirements that she attend certain in-person meetings with her managers and other allegedly inappropriate managerial directives amounted to unlawful discrimination or retaliation. Chapman also bases retaliation claims on various other complaints, including complaints relating to disputes with her managers over work-related travel and the alleged denial of office supplies. All of Chapman's claims of sex discrimination, retaliation, and harassment were rejected by the Department's EEO office.

Chapman also appealed her termination to the U.S. Merit Systems Protection Board ("MSPB"), and a trial was held in December 2009 before an administrative judge that included the testimony of eight witnesses. The administrative judge affirmed the IRS's decision to terminate Chapman, and Chapman's petition for review of the administrative judge's decision to the MSPB was denied.

By counsel, Chapman filed her Complaint with the U.S. District Court for the District of Columbia on June 25, 2010, and an Amended Complaint on October 14, 2010, alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 based largely on claims asserted in her prior EEO complaints. The District Court granted the Secretary's motion for change of venue and transferred the case to this Court on September 21, 2011, by which time Chapman was proceeding *pro se*. On December 8, 2011, the Secretary moved for judgment on the pleadings as to portions of the Amended Complaint and for summary judgment as to the entire Amended Complaint. Chapman has opposed both motions, and a hearing on this matter was conducted in open Court on January 6, 2012, with Chapman appearing telephonically. Upon consideration of the extensive evidentiary and administrative record in this case as well as the parties' written and oral arguments, the Court ordered that the Secretary's Motion for Judgment on the Pleadings and Motion for Summary Judgment are granted on January 10, 2012. In this Memorandum Opinion, the Court sets forth its reasons for granting the Secretary's motions and dismissing the case.

The factual bases for Chapman's employment discrimination and retaliation claims fall under two broad categories: (1) actions taken by her supervisors within the context of her current position with the IRS; and (2) her non-selection for various other positions in the IRS to which she applied. For the sake of continuity in the description of the facts relevant to this case, I will

discuss the relevant non-selections separately from the relevant interactions between Chapman and her supervisors, starting with the latter.

### A. Tamorah Chapman's Employment with the IRS

In September 2002, Tamorah Chapman began working as an Internal Revenue Agent ("IRA") with the IRS at General Schedule Pay Scale ("GS") 9. She was stationed at the Post of Duty ("POD") in Bailey's Crossroads, Virginia, until July 2004. Chapman alleges that, during the time she was stationed at the Bailey's Crossroads POD, she "participated in a group grievance and filed an informal EEO [Equal Employment Opportunity] complaint" and that the Department "maintained information pertaining to [her] informal EEO complaint in her personnel file." Am. Compl. ¶ 8; *see also* Pl.'s Opp'n. at 3. Chapman has not produced evidence to support the allegation that information about this alleged EEO activity was retained in her personnel file, and the Secretary denies the allegation. Def.'s Answer ¶ 8. In July 2004, Chapman was transferred to the Rochester, New York, POD as an IRA, GS-11, with the Small Business Self-Employed Division ("SBSE") division. She returned to the Bailey's Crossroads POD as a Large and Mid-Sized Business ("LMSB") IRA by March 2005 and was GS-13 by March 2006.

### 1. Supervision of Richard Guastello

From March 2005 until June 2008, Chapman's immediate supervisor in Bailey's Crossroads was Richard Guastello. In February 2006, Guastello gave Chapman a "fully successful" Critical Job Elements ("CJE") score of 3.4 on her annual performance appraisal. Def.'s Ex. 89 at 724. On her February 2007 appraisal, Guastello gave Chapman an "exceeds fully successful" CJE score of 4.0. Def.'s Ex. 89 at 725. Chapman alleges that, in the 2007 performance appraisal, Guastello did not take full consideration of the work assigned to her, resulting in an appraisal that was "not as high as it should have been," and that, in this regard,

Guastello treated male members of the team he managed more favorably. Am. Compl. ¶¶ 13, 15; *see also* Pl.'s Opp'n. at 6-7. Chapman alleges further that, as a result of this deficient appraisal, her application to vacant positions within the agency would not receive the appropriate level of consideration. Am. Compl. ¶ 14. The Secretary denies these allegations. Def.'s Answer ¶¶ 13, 14.

After allegedly being "harassed" by the interview panel during her interview for an International Examiner position in May 2007, Chapman told Guastello about her intent to file an EEO complaint about her mistreatment. Guastello has declared that this is the only EEO activity by Chapman of which he has ever been aware prior to her EEO complaint against him later in 2007. Def.'s Ex. 16 at 384.

Chapman alleges various instances of sex discrimination and reprisal by Guastello beginning in 2007, as their working relationship became increasingly strained. Chapman alleges that, in or about June 2007, Guastello began denying her the opportunity to work on developmental Coordinated Industry Cases ("CIC") while continuing to provide CIC work to all male members of the team. Am. Compl. ¶ 22. Guastello has declared that the work Chapman was assigned during the relevant time period was challenging and developmental, that Chapman's workload during this period did not permit additional work to be assigned to her, and that there was "no opportunity to assign [any team member] a CIC case in 2007[.]" Def.'s Ex. 16 at 392. Chapman also alleges that, in July 2007, Guastello failed to conduct her midyear evaluation, though he had conducted evaluations for the male members of the team. Am. Compl. ¶ 23. Guastello has declared that he did present a midyear evaluation to Chapman on July 10 but she did not acknowledge receipt. Def.'s Ex. 16 at 394.

Chapman alleges that, again in December 2007, Guastello "refused" to provide her with a merit evaluation that could be used in her applications for promotional positions within the Service. Am. Compl. ¶ 26. Guastello has denied this allegation, declaring that Chapman requested that the promotional evaluation be completed by a certain date and he responded that he could not complete it by that date. Def.'s Ex. 17 at 412.

IRS managers began noting unprofessional communications from Chapman to her supervisors in December 2007. These communications included curt, dismissive, and indignant responses to inquiries from managers, requests for phone calls and meetings, and management decisions and directives. Def.'s Ex. 40-53. For instance, when, via email, Guastello proposed that he and Chapman discuss a disputed job-related matter, Chapman responded "there is nothing to discuss." Def.'s Ex. 43; *see also* Def.'s Ex. 41 ("What are you talking about?"). She also frequently and rudely accused Guastello of failing to provide adequate review of her cases and failing to perform other job duties, stating, for example, "It does not appear that you have even spent anytime [*sic*] looking through the case file and any effort, and I stress the word any, that you did put forth appears minimal." Def.'s Ex. 44; *see also* Def.'s Ex. 45, 47, 48 ("It appears that, once again, you have not read it."), 49 ("I don't get paid to do your job. It is your responsibility."). When acting territory manager and supervisor to Guastello, Tina Meaux requested a meeting with Chapman about these communications, Chapman denied that she had engaged in any inappropriate conduct and accused Guastello of retaliation. Def.'s Ex. 50. Meaux issued a counseling memorandum as a non-disciplinary warning to Chapman on February 13, 2008, advising her to "cease any inappropriate conduct[.]" Def.'s Ex. 40.

On Chapman's annual performance appraisal, in February 2008, Guastello gave Chapman a higher "exceeds fully successful" CJE score of 4.4. Def.'s Ex. 89 at 726. Chapman

alleges that this appraisal "was not as high as it should have been and was not prepared in accordance with the [applicable] Critical Job Elements [or the National Treasury Employees] Union Contract." Am. Compl. ¶ 34. She claims that the deficient appraisal negatively affected her prospects for obtaining a promotion. Am. Compl. ¶ 35. Chapman submitted a formal rebuttal to the appraisal, alleging discrimination and retaliation by her supervisors. Pl.'s Ex. B at 154-69. According to appraisal documentation submitted by the Secretary, Chapman's 2008 score was the second highest score Guastello gave any employee in 2007 or 2008 and a higher score than five of the six males in Chapman's team. Def.'s Ex. 90. Guastello has declared that this appraisal was "very good" and "a fair reflection of the work [Chapman] performed." Def.'s Ex. 17 at 402.

In June 2008, a series of email correspondences between Chapman and Guastello about one of Chapman's cases included a number of rude and reprehensible messages from Chapman to Guastello, including dismissively responding with "pass" when Guastello suggested holding a conference call with Chapman to discuss the case. Def.'s Ex. 54; *see also* Def.'s Exs. 55, 56 (email from Chapman referring to Guastello and an associate as "[y]ou boys" and stating "I am not sure why either one of you think that I would discuss anything with either of you"), 57 ("[D]o not send me any further emails."). In the days following this exchange, Chapman expressed concerns to territory manager Lehman Dry about Guastello's allegedly discriminatory and retaliatory behavior toward her. Pl.'s Ex. D at 3-4.

When Dry suggested that he and Chapman meet to discuss the recent email exchange between Chapman and Guastello, Chapman requested information about the emails at issue, even though they had already been discussing this specific email exchange. *Id.* On June 27, 2008, Dry notified Chapman that he was considering taking disciplinary action against her due to her failure "to conduct [her]self in a professional manner in the workplace" through an Alternative

8

Discipline ("AD") Notice, which also informed Chapman of her right to request an alternative disciplinary measure. Pl.'s Ex. D at 1-3. Chapman attached a written statement to the AD Notice denying that she was aware of any unprofessional conduct by her or that any specific information about the allegation against her had been provided to her. *Id.* at 2. Chapman did not request alternative discipline. Def.'s Ex. 15 at 230.

On August 1, 2008, Dry took formal disciplinary action against Chapman in the form of a letter of official reprimand for the emails to Guastello. Def.'s Ex. 53. The letter warned Chapman that "[f]uture discipline could be severe[]" if she engaged in further misconduct. *Id.* In her acknowledgement of receipt, Chapman expressed the belief that the reprimand was issued in retaliation for her EEO activity. *Id.*

### 2. Reassignment to Hicks

Due to the contentious relationship between Chapman and Guastello, Dry reassigned Chapman from Guastello to a new team manager, Gerald Tyrone Hicks. Def.'s Ex. 15 at 233. Hicks was based in Richmond, Virginia, but Chapman continued to operate out of the Bailey's Crossroads POD. Dry has testified that the decision to transfer Chapman to Hicks' team was based on Dry's high opinion of Hicks' interpersonal skills and desire to give Chapman a "fresh start." Def.'s Ex. 15 at 234; Def.'s Ex. 22 at 483. However, even after the reassignment to Hicks and the formal reprimand against Chapman for her unprofessional conduct toward Guastello, Chapman continued to make brusque and discourteous comments in her email exchanges with Hicks. Def.'s Exs. 59-64.

Chapman alleges that she complained to Hicks, Dry, and senior manager Bryan Inoue about the lack of advanced CIC work available to her under Hicks but that these complaints were ignored. Am. Compl. ¶ 42. She also alleges that Hicks required her to travel to Richmond

"unnecessarily for meetings that could have been handled by telephone[]" and that Dry and Inoue failed to respond to her complaints about this. Am. Compl. ¶ 44. Hicks has declared that Chapman was required to attend in-person meetings in Richmond only on two occasions—once for an initial meeting to discuss management expectations and critical job elements, and again for a team meeting. Def.'s Ex. 20 at 451-52.

In February 2009, Hicks completed Chapman's annual performance appraisal, providing an "exceeds fully successful" CJE score of 4.4. Def.'s Ex. 89 at 727. Again, Chapman alleges that this appraisal was "not as high as it should have been" and not prepared properly. Am. Compl. ¶ 75. She also submitted a formal rebuttal to the appraisal, in which she alleged retaliation for her EEO activity. Pl.'s Ex. B at 41-55. Hicks has declared his denial these allegations. Def.'s Ex. 20 at 458.

### 3. Reassignment to Helm

Also in February, Chapman sent an email to LMSB Commissioner Frank Ng complaining about Hicks and made a comment to Dry alleging that Hicks "look[ed] at [her] in a sexual way." Def.'s Ex. 15 at 235-36, 334. There is no indication in the record that Chapman ever repeated the sexual harassment allegation, but Dry responded to her initial report by reassigning Chapman to Donna Helm, a team manager based in Wheaton, Maryland. *Id.*; Pl.'s Ex. F at 193. As Helm attempted to schedule meetings with Chapman, Chapman became suspicious that her EEO activity would be the subject matter of these meetings and demanded detailed information about the agenda for subsequent meetings. Pl.'s Ex. F at 196-207. When Chapman raised the issue with respect to a meeting planned for the first week of March 2009, Helm indicated that the meeting would concern work-related travel and disclaimed any intention of discussing EEO matters. Def.'s Ex. 71; Pl.'s Ex. F at 198. Chapman's email communications

10

to Helm about the meeting were curt and antagonistic, arguing that work-related travel was an EEO matter and not an appropriate matter of discussion between them. Def.'s Exs. 71-75. When Helm emailed Chapman to set the date and time for the meeting and to note that it was mandatory, Chapman responded in an email sent to both Helm and Commissioner Ng accusing Helm of "harassment and retaliation on behalf of her supervisor[,]" presumably Dry. Pl.'s Ex. F at 203.

### 4. Meeting of March 4, 2009

On March 4, 2009, the meeting was held between Chapman and Helm with Dry attending via speakerphone. Def.'s Ex. 76. The meeting lasted about three minutes before Helm attempted to discuss a chain of command issue and Chapman departed without permission. *Id.* The chain of command issue was apparently raised in response to Chapman's emails to Ng and senior management about complaints and disputes with her supervisors. Def.'s Ex. 15 at 333-34; Pl.'s Ex. E at 6. According to a document prepared by Helm for the meeting, Helm planned to point out to Chapman that senior management generally refer issues presented by employees to their immediate supervisors for resolution and that emailing senior management could delay resolution. Pl.'s Ex. E at 6. As Helm began to discuss the chain of command issue, Chapman stood up, stated, "Nope, we're done," and walked out of the room. Def.'s Ex. 76; Pl.'s Ex. E at 2. In subsequent emails addressed to Helm and cc'ed to LMSB Commissioner Ng and IRS Commissioner Douglas Shulman, Chapman accused Helm of discrimination and retaliation in insisting on face-to-face meetings and of attempting to interview Chapman about her EEO activity. Pl.'s Ex. F at 208-10. On March 6, 2009, Helm and Dry sent Chapman a counseling memorandum regarding management's expectations of professionalism in the workplace and

citing Chapman's abrupt departure from the March 4 meeting as "unprofessional and inappropriate for the workplace." Pl.'s Ex. E at 1-2.

Next, apparently within a week of the counseling memorandum, Dry sent Chapman an AD Notice indicating that Dry was considering a twelve-day suspension for Chapman for her conduct during the March 4 meeting and for her failure to pay her government travel credit card. Pl.'s Ex. E at 7-8; Pl.'s Ex. F at 1-6; Def.'s Ex. 77. The AD Notice requested that Chapman respond within five days to request alternative discipline. Pl.'s Ex. E at 7-8. On April 10, 2009, Dry sent Chapman a notice of proposed disciplinary action, proposing the 12-day suspension. Def.'s Ex. 77; Def.'s Ex. 21 at 467. By counsel, Chapman responded to the charges in a letter dated April 27, 2009, stating that she believed that the March 4 meeting had no legitimate purpose and was set up merely to "harass and provoke" her. Pl.'s Ex. F at 5. Chapman continued to send Helm rude and discourteous emails on which Commissioner Douglas Shulman and Steven Miller, another high-ranking IRS official, were cc'ed. *See* Def.'s Exs. 73, 74, 75 ("How long have you been an employee of the IRS? How long have you been a manager? You don't know or cant [*sic*] decipher my request below. . . . Steve or Doug can you possible [*sic*] assist Donna?"). On June 18, 2009, after considering Chapman's response to the notice of proposed disciplinary action, Dry imposed a three-day suspension to begin on July 6, 2009, for her conduct at the March 4 meeting, having removed the allegation of financial misconduct. Def.'s Ex. 78.

### 5. Meeting of June 23, 2009

Helm scheduled a meeting with Chapman to discuss a change in work practice, Chapman's requests for supplies, and Chapman's practice of emailing high-ranking officials without going through the chain of command. Def.'s Ex. 15 at 174-76. The meeting took place on June 23, 2009, in Dry's office in Bailey's Crossroads and was attended by Helm, Dry and

Chapman. *Id.* at 180-81. When Chapman arrived, she was informed by Dry that a union representative, Donald Busby, was available to attend the meeting and left to ask him to join the meeting. *Id.* at 181-82. At the December 2009 MSPB hearing, Dry testified to Chapman's "defiant" demeanor in her interactions with Helm during the meeting. *Id.* at 250-51. Busby testified that Helm maintained a "somewhat intimidating" tone of voice and that Chapman appeared increasingly nervous. *Id.* at 288-290. Chapman testified to being accused of wrongdoing and intimidated and to eventually suffering a panic attack during the meeting. *Id.* at 352.

After Helm handed Chapman a letter about the change in work practice, Chapman promptly returned it to Helm and then used Dry's phone to call 9-1-1, requesting assistance because she was being harassed and threatened by her manager. Def.'s Exs. 15, 85. Chapman stated that Helm threw paper at her and was "harassing [her] verbally." Def.'s Ex. 85 at 690. The testimony of Busby, Dry, and Helm establishes that Helm never threw paper at Chapman. Def.'s Ex. 15 at 290. When asked by the 9-1-1 operator whether there were any weapons involved, Chapman stated, "It depends on what you define a weapon as." Def.'s Ex. 85 at 690. After the operator told her that a weapon was anything that could hurt her, Chapman stated that there were weapons. *Id.* When asked what the weapon was, Chapman referred to Helm, stating, "Her, just her. Her behavior." *Id.* at 691. Chapman stated that, by that time, Helm had stopped threatening her but that Helm wanted Chapman to remain present so that she could "continue to harass [her]." *Id.* at 691-92. Dry and Helm testified that Chapman appeared calm during the 9-1-1 call. Def.'s Ex. 15 at 187, 251. After the call, Chapman left the meeting, and an officer with the Federal Protective Service arrived to investigate the incident. Def. Ex. 15. No complaint was

filed against anyone at the meeting upon the officer's finding that no criminal conduct had occurred. *Id.* at 280-81.

### 6. Chapman's Termination

Two days later, on June 25, 2009, Dry issued to Chapman a letter proposing to remove her for unprofessional behavior. Def.'s Ex. 86; Pl.'s Ex. G at 1-2. The specific bases identified for Chapman's removal were: (1) refusing to answer whether she was tape recording the June 23 meeting; (2) stating that she would tell the taxpayer in one of her cases that the agency refused to provide transportation for her; (3) stating that she would send emails to whomever she wants when Helm advised that emails about routine matters not be directed to IRS commissioners; (4) stating that she was entitled to use leave whenever she wants when Helm advised her to request leave in advance; (5) throwing a letter documenting a change in work practice back after being handed the document and glancing at it; (6) placing a 9-1-1 call and advising the operator that Helm was harassing her; and (7) leaving the meeting before it was concluded. *Id.* The June 18, 2009, suspension decision and the August 4, 2008, reprimand for unprofessional behavior were also factors in Dry's proposal to remove Chapman. Def.'s Ex. 86 at 698; Pl.'s Ex. G at 2.

Chapman, by counsel, submitted a written response to the proposal of removal, arguing that she had conducted herself professionally, that the June 23 meeting was held "for the sole purpose of harassing and provoking [her]," that the proposed removal was retaliation for her EEO activity, and that, at the meeting, Helm and Dry falsely accused Chapman of wrongdoing and told Chapman that she would be subjected to different work conditions than her coworkers without allowing Chapman an opportunity to defend herself. Pl.'s Ex. G at 3-5. Chapman also denied all of the allegations in the removal proposal letter with the exception of calling 9-1-1 and

leaving the meeting after the call but argued that the 9-1-1 call and leaving without permission were justified as she feared for her safety and well-being. Pl.'s Ex. G at 6-8.

On August 13, 2009, Walter Harris, the industry director of financial services at IRS and senior manager to Inoue and Dry, made the determination to remove Chapman from the IRS, affirming the seven bases set forth by Dry for her removal. Def.'s Ex. 87. In a decision letter to Chapman, Harris stated that he had considered Chapman's responses but was persuaded that there were "no discriminatory motives" for the removal. *Id.* at 700. Harris stated that, in view of Chapman's conduct at the June 23 meeting as well as her prior progressive discipline, Chapman's "misconduct has impaired the efficiency of the Service" and a penalty for this misconduct lesser than removal "would be inadequate." *Id.* at 701. Harris also informed Chapman of her right to appeal the decision to the MSPB. *Id.* at 701-03. Chapman refused to acknowledge the decision letter when Dry presented it to her on August 14. *Id.* at 703.

**B.  Tamorah Chapman's Non-Selection for Vacant Positions**

A significant number of Chapman's sex discrimination and retaliation claims are based on her non-selection for various positions within the IRS to which she had applied. Before describing these specific non-selections, I will describe the process under which Chapman's applications to these positions were considered.

**1.  Selection Process**

During all times relevant to the non-selection claims asserted in this action, the IRS selected internal candidates for vacancies according to the following procedures provided for in its collective bargaining agreement with the National Treasury Employees Union ("NTEU"). *See* Def.'s Ex. 109 at 841-52. First, a list of internal applicants best qualified for the vacant position ("BQ list") is created through a ranking process assigned to a manager or a ranking panel

comprised of managers who do not supervise any of the applicants for the vacant position. *Id.* at 846-47; Def.'s Ex. 37 at 595; Def.'s Ex. 24 at 498. Based on information provided in the applicants' performance appraisals, each member of the ranking panel or ranking official numerically rates each applicant for each critical job element of the position to be filled and prepares a written statement about each applicant with respect to each critical job element. Def.'s Ex. 109 at 847; *see also* Def.'s Ex. 94. The information generated by the ranking panel is sent to Human Resources ("HR"), which, based on this information, creates the BQ list after determining which applicants are most highly ranked. Def.'s Ex. 24 at 499; Def.'s Ex. 37 at 595.

Next, HR sends the selecting official in the regional division of the IRS ("territory") where the vacant position is located a certification to hire from the BQ list. Def.'s Ex. 109 at 849; Def.'s Ex. 37 at 595. The selecting official may form an interview panel comprised of managers who do not supervise applicants on the BQ list. Def.'s Ex. 37 at 595. The interview panel conducts interviews of applicants on the BQ list and then provides notes and a recommendation to the selecting official. *Id.*; *see also, e.g.*, Def.'s Ex. 33 at 561. The selecting official typically follows the recommendation of the interview panel and hires the recommended applicants. Def.'s Ex. 37 at 595. The interview panel is not required to make a recommendation for the vacant position, and the selecting official is not required to fill the vacant position, so some vacancies are closed without being filled. Def.'s Ex. 109 at 843-44.

## 2. Chapman's Non-Selections

In or about February 2007, Chapman applied to several lateral LMSB IRA positions at the Rochester POD, including positions as an IRA International Examiner (vacancy number 60-62-LMB70252) and an IRA Team Member (vacancy number 60-66-LMB70294). Chapman alleges that her non-selection for these positions was discriminatory and retaliatory. A male

16

applicant, a licensed attorney with an LLM degree in international law and International Examiner training, was selected for one of the two International Examiner positions. Def.'s Ex. 23 at 2. No one was selected for the other International Examiner position or the Team Member position, and the vacancy was closed. Robert P. Berg, the selecting official for the International Examiner positions, declared that he had no knowledge of Chapman's prior EEO activity and that the decision to select the male applicant over Chapman was based on the former's training and experience. Def.'s Ex. 23 at 490. Robert Hatler, the selecting official for the Team Member position, also declared that he was unaware of Chapman's EEO activity at the time he declined to select anyone for that position. Def.'s Ex. 24 at 500.

In December 2007 and January 2008, Chapman was non-selected for vacant IRA Senior CEP Team Coordinator positions (vacancy number 60-66-LMSB80337) and a vacant IRA Senior International Examiner position (vacancy number 60-66-LMB80348). Chapman alleges that her supervisor Guastello's failure to provide her with a promotional evaluation prevented her from making the BQ list for the Senior International Examiner position and that she was discriminated against in the selection of male applicants for the Senior CEP Team Coordinator positions. Am. Compl. ¶¶ 25-27. Lynch, the selecting official for the Senior CEP Team Coordinator positions, has declared that his selection was based on the qualifications possessed by the selectees, including Certified Public Accountant ("CPA") certification and familiarity with the taxpayers targeted by these positions—qualifications that Chapman lacked. Def.'s Ex. 28. Lynch has also declared that he had no knowledge of Chapman's prior EEO activity at the time his selection decisions were made. Def.'s Ex. 28 at 5.

In February 2008, Chapman was non-selected for an IRS Coordinator position (vacancy announcement 60-66-LMSB80506) having failed to make the BQ list for the selecting official's

17

consideration. Def.'s Ex. 93. Chapman alleges that her supervisors' retaliatory refusal to provide

her with CIC work prevented her from making the BQ list. Am. Compl. ¶ 30. The ranking

worksheets completed for this position indicate that Chapman was ranked lower than other

applicants for the critical job elements of customer satisfaction and business results. Def.'s Ex.

94. Chapman's lack of advanced degrees, CPA certification, and substantial LMSB experience

were also noted. *Id.* at 742-43.

In January and February 2009, Chapman was non-selected for eleven vacant positions,

and, between April and July 2009, she was non-selected for another ten positions. ¶¶ 65, 66, 104.

These positions included IRA Senior CEP Team Coordinator, IRA International Examiner, IRA

Account Coordinator, IRA Financial Products & Transactions Examiner, IRA Team Leader, and

IRA Team Member. Am. Compl. Chapman alleges that she was qualified for all of these

positions and that her non-selection was retaliatory.

## II.    MOTION FOR JUDGMENT ON THE PLEADINGS

The Court grants the Secretary's Motion for Judgment on the Pleadings as to Paragraphs

57, 61, 65, 66, 70, 104, and 107 because the Amended Complaint fails to set forth sufficient facts

to support Chapman's claims that she was non-selected for the positions listed in Paragraphs 65,

66, and 104 for discriminatory or retaliatory reasons and that IRS officials were non-responsive

to her complaints as described in Paragraphs 57, 61, 70, and 107 for discriminatory or retaliatory

reasons.

### A.  STANDARD OF REVIEW

A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil

Procedure allows defendants to test the sufficiency of a complaint after the pleadings are closed.

A Rule 12(c) motion based on a plaintiff's failure to state a claim for relief is assessed under the same standard as a Rule 12(b)(6) motion to dismiss. *Walter v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009). A Rule 12(b)(6) motion should be granted unless an adequately stated claim is "supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (internal citations omitted). A complaint is insufficient if it relies upon "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). A complaint must set forth "a claim for relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). In considering a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Because the central purpose of the complaint is to provide the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the defendant to prepare a fair response. *Twombly*, 550 U.S. at 556 n.3.

## B. ANALYSIS

The Court grants the Secretary's Motion for Judgment on the Pleadings as to Paragraphs 57, 61, 65, 66, 70, 104, and 107 of the Amended Complaint because the Amended Complaint does not contain sufficient factual content to support Title VII claims for employment discrimination or retaliation based on the management actions alleged in these paragraphs. Title VII of the Civil Rights Act of 1964 broadly forbids employers from discriminating against

employees on the basis of the employees' sex or gender. 42 U.S.C. § 2000e-2(a); *see also, e.g.,*

*Hux v. City of Newport News, Va.*, 451 F.3d 311, 314 (4th Cir. 2006). Additionally, Title VII

prohibits employers from retaliating against employees because they complained or filed charges

of discrimination or participated in a discrimination proceeding. 42 U.S.C. § 2000e-3(a); *see also*

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006). A Title VII plaintiff is not

required "to plead facts establishing a *prima facie* case,"[1] *Swierkiewicz v. Sorema N.A.*, 534 U.S.

506, 511 (2002), but she must plead sufficient facts "to raise a right to relief above the

speculative level" and "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S.

at 555, 570; *see also Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). The

facts alleged in the Amended Complaint are not sufficient to raise above the speculative level

and render plausible Chapman's right to relief under Title VII based IRS senior managers'

failure to respond to Chapman's concerns as alleged in Paragraphs 57, 61, 70, and 107 or

Chapman's non-selection for the vacant positions listed in Paragraphs 65, 66, and 104.

### 1. Paragraphs 57, 61, 70, and 107

Chapman's pleading of any Title VII discrimination or retaliation claim based on the

allegations in Paragraphs 57, 61, 70, and 107 is insufficient. In these paragraphs, Chapman

alleges that senior managers within the IRS discriminated and retaliated against her by ignoring

---

[1] In the absence of direct evidence, the elements of a *prima facie* case of discrimination under Title VII are: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). In a non-selection or failure-to-promote context, the elements are: "(1) plaintiff is a member of a protected group; (2) plaintiff applied for the position in question; (3) plaintiff was qualified for the position; and (4) plaintiff was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 928 F.2d 118, 121 (4th Cir. 1991). The elements of a *prima facie* case of retaliation under Title VII are that: "(1) [plaintiff] engaged in a protected activity; (2) [her employer] acted adversely against him; and (3) the protected activity was causally connected to the adverse action." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007), *cert. denied*, 552 U.S. 1102 (2008).

her reports of discrimination, retaliation, and harassment by her immediate supervisors and concerns about her safety. Specifically, in Paragraphs 57, 61, and 70, she alleges that senior managers Bryan Inuoe, Feliciano Ramona, and Walter Harris ignored concerns she expressed to them about her safety and reports of retaliation and harassment by Tyrone Hicks and Leyman Dry from June 2008 to February 2009. Chapman asserted claims for harassment and retaliation based on management's failure to respond in the third EEO complaint upon which this suit is based (IRS-08-0727-F). In Paragraph 107, Chapman alleges that upper management, Steven Miller and Douglas Shulman, ignored "her concerns regarding her safety and well being" based on alleged "retaliatory and discriminatory behavior" by Donna Helm and Leyman Dry from February to May 2009. Chapman asserted claims for harassment and retaliation based on management's failure to respond to these concerns in the fifth EEO complaint upon which this suit is based (IRS-10-0174-F).

The Amended Complaint does not include factual allegations sufficient to state a claim for Title VII sex discrimination or retaliation based on non-responsiveness by managers alleged in Paragraphs 57, 61, 70, and 107. While, based on the facts alleged, it is *possible* that the senior managers ignored Chapman's reports and concerns because she is a woman or because she had complained of discrimination in the past, there are not enough facts alleged to render either claim *plausible*. There are no allegations suggesting that Chapman's sex or protected EEO activities caused Inuoe, Ramona, Harris, Miller, or Shulman to ignore Chapman's communications or otherwise influenced any decision these managers made to ignore her. No reasonable inference of discrimination or retaliation by the accused managers can be drawn from the facts alleged. One would be required to speculate as to any discriminatory or retaliatory motives by the accused managers. For these reasons, the Court finds that the Amended Complaint fails to state

Title VII claims based on these allegations of manager non-responsiveness, and the Secretary is entitled to judgment on the pleadings as to Paragraphs 57, 61, 70, and 107. *See Iqbal*, 556 U.S. at 678 (complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"); *Twombly*, 550 U.S. at 555, 570 (plaintiff must plead sufficient facts "to raise a right to relief above the speculative level").

### 2. Paragraphs 65, 66, and 104

Chapman's pleading of any Title VII discrimination or retaliation claim based on the allegations in Paragraphs 65, 66, and 104 is similarly insufficient. These paragraphs list a total of twenty-one positions in the Bailey's Crossroads and Rochester offices of the IRS for which Plaintiff Chapman alleges that she was non-selected for discriminatory and retaliatory reasons. Chapman alleges that she became aware of the eleven non-selections alleged in Paragraphs 65 and 66 between January 5, 2009, and February 17, 2009, and asserted claims for discrimination and retaliation based on these non-selections in the third EEO complaint upon which this suit is based (IRS-08-0727-F). She also asserted retaliation claims in the fifth EEO complaint upon which this suit is based (IRS-10-0174-F) based on the ten non-selections alleged in Paragraph 104.

Chapman does not adequately plead Title VII claims based on the non-selections listed in Paragraphs 65, 66, and 104. Again, the Amended Complaint does not include sufficient facts to render plausible Chapman's claim that she was non-selected for these twenty-one positions for discriminatory or retaliatory reasons. There are no allegations suggesting that Chapman's sex or protected EEO activities influenced the decision of selecting officials not to select her for these positions. Based on the facts alleged, the inference that Chapman was not qualified for the positions at issue is every bit as plausible as the inference that her sex or prior EEO activities

influenced the non-selection decisions. Again, one is forced to speculate as to any discriminatory or retaliatory motives by the selecting officials with respect to these vacancies.

Thus, Chapman fails to state a claim for discrimination or retaliation under Title VII based on the allegations in Paragraphs 57, 61, 65, 66, 70, 104, and 107 of her Amended Complaint. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555, 570. Under Rule 12(c), the Secretary is entitled to judgment on the pleadings as to any Title VII claims Chapman would base on the allegations in these paragraphs.


## III.   MOTION FOR SUMMARY JUDGMENT

The Court grants the Secretary's Motion for Summary Judgment because: (1) Chapman failed to exhaust her administrative remedies for claims based on the management actions alleged in Paragraphs 79 and 83 of the Amended Complaint; (2) Chapman presents no evidence that the legitimate reasons offered for her non-selection for vacant positions, the formal disciplinary actions taken against her, and her ultimate removal from the IRS were merely a pretext for discrimination or retaliation; and (3) Chapman fails to present *prima facie* cases of Title VII sex discrimination or retaliation based on several of her non-selections, her work performance appraisals and evaluations, travel- and meeting attendance-related job requirements, non-disciplinary warnings, reassignment to different supervisors, and the various other management actions set forth in her Amended Complaint.

### A. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. In reviewing a motion for

23

summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *see also Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 248. Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## B. ANALYSIS

The Court grants the Secretary's Motion for Summary Judgment because the Secretary meets his burden of showing that no genuine dispute of material fact remains in this Title VII suit. First, based on the record, the Court concludes that Plaintiff Chapman failed to assert two of

her claims at the administrative level and that these two claims may be dismissed as unexhausted. Second, Plaintiff Chapman fails to meet her evidentiary burdens under the *McDonnell Douglas* burden-shifting framework employed by courts to assess Title VII claims for which the plaintiff lacks direct evidence of discrimination.

### 1. Unexhausted Claims

Some of the Title VII claims asserted in the Amended Complaint are not properly before the Court and must be dismissed because the record does not reflect that Plaintiff Chapman asserted these claims in any EEO complaint filed with the Department. A Title VII plaintiff must exhaust her administrative remedies before bringing suit in federal court. *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005). For aggrieved federal-sector employees, like Chapman, administrative remedies are provided through agencies' EEO programs as governed by 29 C.F.R. §§ 1614.101-.110. The only claims that can be maintained in Chapman's Title VII suit are those stated in the EEO complaints filed with the Department and "developed by reasonable investigation of [those] complaint[s]" at the administrative level. *Evans v. Techs. Applications & Serv.*, 80 F.3d 954, 963 (4th Cir. 1996). In this way, Chapman's EEO complaints and the record developed through the administrative proceedings "frame[] the scope" of the present litigation. *Chacko*, 429 F.3d at 506.

The Amended Complaint suggests that, in the fourth EEO complaint upon which this suit is based (IRS-09-0547-F), Chapman raised discrimination and/or retaliation claims based on: (1) her manager Helm's display of "information pertaining to Ms. Chapman's EEO complaints" on an electronic calendar accessible to other IRS employees, Am. Compl. ¶ 79; and (2) Chapman's non-selection for the Senior CEP Team Member vacancy 09PH4-LMB0261-14-JC-IRA, Am. Compl. ¶ 83. However, the copy of the EEO complaint in the record does not contain a statement

of either of these claims. *See* Def.'s Ex. 5. Thus, the Court concludes that these claims are

unexhausted, are not properly before the Court, and must be dismissed. *See Chacko*, 429 F.3d at

513 (dismissing unexhausted Title VII claims).

### 2. Applying the *McDonnell Douglas* Framework

The Court grants the Secretary's Motion for Summary Judgment as to Plaintiff

Chapman's exhausted claims because she fails to meet her evidentiary burdens under the burden-

shifting framework employed by courts to assess Title VII claims for which the plaintiff lacks

direct evidence of discrimination.

When a Title VII plaintiff lacks direct evidence of discrimination or retaliation, she may

utilize the burden-shifting framework articulated by the U.S. Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), to prove her claims. *Hux*, 451 F.3d at 314; *see*

*also Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (applying *McDonnell Douglas*

framework in Title VII retaliation context). The plaintiff must make out a *prima facie* case of

Title VII discrimination or retaliation, shifting to the defendant the burden of providing

legitimate, non-discriminatory or non-retaliatory reasons for its adverse employment decision.

*Hux*, 451 F.3d at 314-15. To make out a *prima facie* case of discrimination under Title VII, the

plaintiff must show that: (1) she is a member of a protected class; (2) her job performance was

satisfactory; (3) an adverse employment action was taken against her; and (4) similarly-situated

employees outside the protected class received more favorable treatment. *Coleman*, 626 F.3d at

190; *see also White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). To present a

*prima facie* case of discriminatory non-selection or failure to promote, the plaintiff must show

that she: (1) is a member of a protected group; (2) applied for the position in question; (3) was

qualified for the position; and (4) was rejected for the position under circumstances giving rise to

an inference of unlawful discrimination. *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994) (citing

*McDonnell Douglas*, 411 U.S. at 802). *See also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

248, 253 (1981); *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 928 F.2d 118, 121 (4th Cir.

1991). To make out a *prima facie* case of retaliation under Title VII, a plaintiff must show that:

(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a

causal connection existed between the protected activity and the adverse employment action.

*Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007), *cert. denied*, 552 U.S.

1102 (2008); *see also Price*, 380 F.3d at 212.

      Once the plaintiff presents a *prima facie* case of Title VII discrimination or retaliation,

the burden shifts to the defendant to produce evidence of legitimate, non-discriminatory reasons

for the actions taken. *Hux*, 451 F.3d at 314-15. If the defendant offers non-discriminatory and

non-retaliatory reasons for conduct actionable under Title VII, the plaintiff must "prove by a

preponderance of the evidence that the legitimate reasons offered by the defendant were not its

true reasons, but were a pretext" for discrimination or retaliation. *Reeves v. Sanderson Plumbing

Prods., Inc.*, 530 U.S. 133, 143 (2000). *See also McDonnell Douglas*, 411 U.S. at 804; *Hux*, 451

F.3d at 315; *Price*, 380 F.3d at 212.

      In this case, Chapman fails to offer any direct evidence of sex discrimination or

retaliation as to any of her claims and fails to meet her burden of setting forth *prima facie* cases

of Title VII sex discrimination or retaliation on most of her claims. Where Chapman successfully

makes out a *prima facie* case of Title VII discrimination or retaliation, the Secretary meets his

burden of producing evidence that the adverse employment action was taken for non-

discriminatory and non-retaliatory reasons. Chapman fails to produce any evidence that these

legitimate reasons are merely a pretext for discrimination and retaliation.

### a. Legitimate Non-Discriminatory and Non-Retaliatory Reasons for Adverse Employment Actions Against Plaintiff Chapman

The Court grants the Secretary's Motion for Summary Judgment as to Chapman's Title VII claims based on formal disciplinary actions taken against her in August 2008 and June 2009, the termination of Chapman's employment in August 2009, and her non-selection for IRA International Examiner and Senior CEP Team Coordinator positions to which she applied. There is no genuine issue as to whether Chapman was formally disciplined and terminated for legitimate reasons related to multiple instances of her unprofessional behavior or whether Chapman was non-selected for legitimate reasons related to her lack of qualifications for the IRA International Examiner and Senior CEP Team Coordinator positions. Chapman has failed to respond with evidence of pretext to the Secretary's evidence supporting the IRS's legitimate reasons for these employment decisions.

### i. Non-Selection for CEP Team Coordinator and International Examiner Positions (Vacancy Numbers 60-66-LMSB80337, 60-66-1L90168, 60-62-LMB70252, and 60-62-1L90139)

The Secretary has produced evidence of legitimate, non-discriminatory and non-retaliatory reasons for non-selecting Chapman to fill the IRA Senior CEP Team Coordinator vacancy number 60-66-LMSB80337 or IRA International Examiner vacancy numbers 60-66-1L90168, 60-62-LMB70252, and 60-62-1L90139. Chapman was non-selected due to her lack of qualifications and, in the case of the IRA International Examiner positions announced in vacancy number 60-66-1L90168, her lack of preparedness for the employment interview. The Secretary has offered declarations from the IRS officials who made the selection decisions with respect to these vacancies and members of an interview panel who declined to recommend Chapman for selection, which set forth non-discriminatory reasons for their decisions.

Thomas J. Lynch selected two male applicants to fill the Senior CEP Team Coordinator vacancy number 60-66-LMSB80337 and made the decision to close the International Examiner vacancy number 60-66-1L90168 without selecting anyone. Def.'s Ex. 28. Lynch declared that he had no knowledge of Chapman's prior EEO activity at the time these decisions were made and that the decision to select the male selectees for the Senior CEP Team Coordinator positions over Chapman was based on their training and experience. Def.'s Ex. 28 at 515, 517; Def.'s Ex. 32 at 549. One of the selected applicants had two and a half years of LMSB experience, familiarity with the corporate taxpayer targeted by the position, a Master's degree in Taxation, CPA certification, and extensive experience in finance and accounting outside of the IRS. Def.'s Ex. 28 at 524. The other selected applicant had CPA certification, familiarity with the targeted taxpayer through prior assignment to the case for which the position was created, and 20 years of experience as a GS-13 and GS-14 International Examiner. *Id.* Chapman, on the other hand, had only one year of LMSB experience with no CEP/CIC experience, no familiarity with the targeted taxpayer, and no professional certification or advanced degree. *Id.* at 515, 524. The reasons offered by Lynch are legitimate, non-discriminatory reasons for Chapman's non-selection for the Senior CEP Team Coordinator position.

Lynch also declared that the decision to non-select Chapman for the International Examiner vacancy number 60-66-1L90168, despite the fact that she was the only internal applicant for the position, was that her interview notes reflected her lack of preparedness for the interview and lack of understanding of "team dynamics." Def.'s Ex. 32 at 546. Ingrid Jeffries and Kathleen Sadowsky, members of the panel that interviewed Chapman for the position, declared that they had no knowledge of Chapman's prior EEO activity when they declined to recommend Chapman for the position and submitted their interview notes to Lynch. Def.'s Ex.

33 at 564; Def.'s Ex. 34 at 572. A third member of the interview panel, Renee Bowers, declared that Chapman was not recommended for the position because she had little to no international experience. Def.'s Ex. 35 at 575.  Additionally, Lynch declared that Chapman's sex, as suggested by her name, did not cause or influence the non-selection decision. Def.'s Ex. 32 at 547. The reasons offered by Lynch and Bowers are legitimate, non-discriminatory reasons for Chapman's non-selection for the International Examiner vacancy number 60-66-1L90168.

Robert P. Berg selected a male applicant to fill the IRA International Examiner vacancy number 60-62-LMB70252. Berg declared that he had no knowledge of Chapman's prior EEO activity and that the decision to select the selectee over Chapman was based on the former's training and experience. Def.'s Ex. 23 at 490. The selected applicant had attended two phases of International Examiner training, had been evaluated as "a fully successful Grade 13 International Examiner," and was a licensed attorney with an LLM degree in international law and experience working on anti-dumping and customs with the U.S. Department of Commerce. *Id.* Chapman, on the other hand, had very limited international experience and knowledge, no International Examiner training, no experience with complex tax examinations, and no advanced degree. *Id.* The reasons offered by Berg are legitimate, non-discriminatory reasons for Chapman's non-selection for the International Examiner position.

Lynch, Bowers, and Berg articulate legitimate reasons for their non-selection—and, in Bowers' case, non-recommendation—of Chapman for International Examiner positions relating to her lack of qualifications that also justify her non-selection for the International Examiner vacancy number 60-62-1L90139. In sum, unlike successful applicants to International Examiner positions, Chapman had limited international experience and knowledge and no International Examiner training. *See id.*; Def.'s Ex. 35 at 575; Def.'s Ex. 32 at 546.

Chapman has failed to meet her burden of proving that the legitimate reasons offered for her non-selection for these vacant positions were a pretext for discrimination and retaliation. *See Reeves*, 530 U.S. 133, 143 (Title VII defendant's articulation of legitimate, non-discriminatory reasons for adverse action shift burden to plaintiff to show pretext). Based on the record before the Court, the IRS's non-discriminatory and non-retaliatory reasons for declining to select Chapman for these positions cannot be reasonably disputed. For this reason, the Court holds that the Secretary is entitled to summary judgment as to any claims of discrimination or retaliation based on Chapman's non-selection for the IRA Senior CEP Team Coordinator vacancy number 60-66-LMSB80337 and the IRA International Examiner vacancy numbers 60-66-1L90168, 60-62-LMB70252, and 60-62-1L90139. *See Matsushita*, 475 U.S. at 586-87 (party opposing properly supported motion for summary judgment has burden of showing genuine issue of material fact).

### ii. Formal Disciplinary Actions and Termination

The Secretary has also produced evidence of legitimate, non-discriminatory and non-retaliatory reasons for taking formal disciplinary action against Chapman in August 2008 and June 2009 and ultimately terminating her in August 2009. Leyman Dry issued a letter of reprimand to Chapman in August 2008 for a series of inappropriate emails Chapman sent to her supervisors on June 2, June 3, and June 4, 2008. Def.'s Ex. 53. In these emails, copies of which have been produced and presented to the Court, Chapman rudely dismissed requests from her supervisor to have a work-related conference call. Def.'s Exs. 54, 56, 57.

Dry suspended Chapman for three days in July 2009 for walking out of a meeting with her immediate supervisor, Donna Helm, on March 4, 2009 without permission or good cause. Def.'s Exs. 77, 78. A transcript of the meeting demonstrates that, after some brief discussion

about reimbursement for Chapman's costs of travel to case sites, Chapman abruptly ended the

meeting and walked out when Helm mentioned "chain of command," apparently in order to

advise against Chapman's practice of sending complaints about her supervisors to senior

managers and high-level IRS officials. Def.'s Ex. 76; Pl.'s Ex. E at 6. On June 18, 2009, Dry

imposed a three-day suspension for Chapman's "rude and discourteous behavior" at the March 4

meeting, which was decided to begin on July 6, 2009. Def.'s Exs. 77, 78.

     The decision to terminate Chapman's employment in August 2009 was made based upon

of her egregious conduct during a meeting with Dry and Helm in Dry's office on June 23, 2009,

as well as the 2008 letter of reprimand and 2009 suspension. Def.'s Exs. 86, 87. At the meeting,

after Helm handed Chapman a letter about a change in work practice and Chapman returned it,

Chapman used Dry's phone to call 9-1-1, requesting assistance because she was being harassed

and threatened by her manager. Def.'s Exs. 15, 85. The record evidence, including the testimony

at the MSPB trial in December 2009 about the June 13 meeting, does not reflect that Helm was

harassing or threatening Chapman before or during the 9-1-1 call. Busby testified that Helm

spoke with an "intimidating" tone of voice and that Chapman appeared nervous at times but not

that Helm or Dry harassed or threatened Chapman. Def.'s Ex. 15 at 147-150. Chapman testified

to suffering a panic attack during the meeting but did not communicate that fact to anyone at the

meeting, or the 9-1-1 operator, and she did not appear to be having a panic attack to Busby,

Helm, or Dry. Def.'s Ex. 15, 85.

     After the call, Chapman left the meeting without permission, and an officer with Federal

Protective Service arrived to investigate the incident. Def.'s Ex. 15. Chapman did not advise the

officer that she had been experiencing a panic attack, and the only "harassment" she indicated

had taken place was receiving instructions and work assignments from her manager. *Id.* at 281-

83. After speaking with Chapman and the managers, the officer determined that no criminal activity had taken place. *Id.* at 283-84.

The IRS terminated Chapman's employment for unprofessional behavior at the June 23 meeting involving the unwarranted call to 9-1-1. Def.'s Ex. 87. In making the removal decision, the Service took into account the August 2008 reprimand and June 2009 suspension decision. *Id.*

The termination of Chapman's employment and the prior related reprimand and suspension each constitute adverse employment actions under Title VII, *see, e.g., Holland,* 487 F.3d at 214, but the reasons offered for these actions are legitimate and non-discriminatory. Chapman has failed to meet her burden of proving that the legitimate reasons offered for the termination and disciplinary actions taken against her were a pretext for discrimination and retaliation. *See Reeves,* 530 U.S. 133, 143 (Title VII defendant's articulation of legitimate, non-discriminatory reasons for adverse action shift burden to plaintiff to show pretext). Based on the record before the Court, the IRS's non-discriminatory and non-retaliatory reasons for taking action against Chapman cannot be reasonably disputed. For this reason, the Court holds that the Secretary is entitled to summary judgment as to any claims of discrimination or retaliation based on the formal disciplinary actions taken against Chapman and on her removal from the Service. *Matsushita,* 475 U.S. at 586-87 (party opposing properly supported motion for summary judgment has burden of showing genuine issue of material fact).

### b. Plaintiff's Failure to Present *Prima Facie* Cases of Title VII Sex Discrimination or Retaliation Based on her Remaining Claims

The Court grants the Secretary's Motion for Summary Judgment as to all remaining claims because Plaintiff Chapman fails to present *prima facie* cases of Title VII discrimination or retaliation based on her non-selection for the IRA Team Member vacancy number 60-66-

LMB70294 and other management actions indicated in the Amended Complaint and in the record before the Court.

### i. Sex Discrimination and Retaliation Claims Based on Non-Selection for the IRA Team Member Position (Vacancy Number 60-66-LMB70294)

Chapman's Title VII claim based on her non-selection for the IRA Team Member vacancy number 60-66-LMB70294 fails as a matter of law because Chapman fails to offer evidence supporting all elements of either sex discrimination or retaliation based on this non-selection.

To make out a prima facie case of sex discrimination under Title VII based on non-selection, Chapman "must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253; *see also Carter*, 33 F.3d at 458. In order to raise an inference of unlawful sex discrimination, Chapman must present some evidence that male applicants received more favorable treatment than she in the selection process. *See White*, 375 F.3d at 295 (*prima facie* case requires showing "that similarly-situated employees outside of the protected class received more favorable treatment" than plaintiff); *Ocheltree v. Scollon Prods.*, 335 F.3d 325, 339 (4th Cir. 2003) ("emphasis on [sex] discrimination as *sex differential* treatment") (emphasis in original), quoting *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 260 (4th Cir. 2001); *Saunders v. Stone*, 758 F.Supp. 1143, 1147 (E.D.Va. 1991) (differential treatment between member of protected class and others outside protected class creates inference of discrimination). Evidence that the IRS filled the position with a male applicant outside the protected group or left the position open while continuing to seek applicants with Chapman's qualifications would give rise to an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Carter*, 33 F.3d at 458.

To make out a *prima facie* case of Title VII retaliation based on non-selection, Chapman must show that she was non-selected *"because* [she] engaged in a protected activity." *Holland,* 487 F.3d at 218, quoting *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir. 1997) (emphasis in original). In order to prove this causal connection, Chapman must prove that the managers involved in the non-selection decision knew that Chapman engaged in the protected activity of filing EEO complaints. *See Dowe,* 145 F.3d at 657 ("employer's knowledge that that the plaintiff engaged in a protected activity is absolutely necessary to establish" requisite causal connection to prove prima facie case of retaliation); *Holland,* 487 F.3d at 218; *Orenge v. Veneman,* 218 F.Supp.2d 758, 765-766 (D.Md. 2002) (plaintiff asserting Title VII retaliation claim for employer's failure to promote had burden and failed to establish causal connection because plaintiff "failed to show that [manager] had knowledge of [p]laintiff's protected EEO activity . . . when he denied her promotion request").

Chapman fails to make out *prima facie* cases of sex discrimination and retaliation based on her non-selection for the IRA Team Member vacancy number 60-66-LMB70294. First, she cannot prove that similarly-situated male applicants to this position received more favorable treatment than her because management declined to select anyone for this position and closed the vacancy. Def.'s Ex. 92. There can be no evidence that similarly qualified male applicants fared better in the selection process for positions for which no selections were made. Chapman fails to present any evidence to support the inference that management discriminated against her on the basis of sex in its decision to select to close IRA Team Member vacancy without filling it.

Similarly, Chapman fails to make out a *prima facie* case of Title VII retaliation based on her non-selection for the IRA Team Member position because she fails to offer any evidence demonstrating a causal connection between her protected EEO activities and management's

decision not to select her for the position. Mark Frost, the selecting official for the position, declared that he was unaware of Chapman's EEO activity at the time of the selection decision. Def.'s Ex. 27 at 510. Without knowledge of Chapman's prior EEO activities, these protected activities could not have influenced or caused the selecting official to non-select her for the position. *See Dowe*, 145 F.3d at 657 (manager's knowledge of protected activity is necessary to establish causal connection between protected activity and adverse action taken by manager).

Thus, Chapman fails to present *prima facie* cases of Title VII discrimination or retaliation based on her non-selection for the IRA Team Member vacancy number 60-66-LMB70294, and the Secretary is entitled to judgment as a matter of law as to any Title VII claim based on this non-selection.

### ii. Remaining Discrimination and Retaliation Claims

Plaintiff fails to set forth *prima facie* cases of Title VII sex discrimination or retaliation based on the varied complaints that remain in this case, including complaints about performance appraisals and evaluations, travel- and meeting-related job requirements, non-disciplinary counseling memoranda and warnings, and reassignment to different supervisors. These actions by management do not constitute adverse employment actions under Title VII.

In order to satisfy the adverse employment action element of a Title VII claim, the action must be materially adverse and have a significant rather than trivial detrimental effect on the claimant. *See, e.g., Burlington N. & Santa Fe Ry.*, 548 U.S. at 68. In a discrimination context, an adverse employment action "adversely affects the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004); *see also* 42 U.S.C. § 2000e-2(a). Examples include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v.*

*Goldin*, 178 F.3d 253, 255 (4th Cir. 1999); *see also Holland*, 487 F.3d at 219. In a retaliation

case, "a plaintiff must show that a reasonable employee would [have been] dissuaded [by the

adverse action] from making or supporting a charge of discrimination." *Burlington N. & Santa*

*Fe Ry.*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006), and

*Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (internal quotations

omitted)). In limiting what sorts of management actions constitute adverse action under Title

VII, the Supreme Court has recognized the danger that management decisions disfavored by

employees and inconveniences commonly presented at work could provide grounds for

employees who had reported workplace discrimination or harassment to assert colorable

retaliation claims under Title VII. "An employee's decision to report discriminatory behavior

cannot immunize that employee from those petty slights or minor annoyances that often take

place at work[,]" which normally do not deter employees from reporting discriminatory

treatment by their employers. *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68. Thus, "[t]he

antiretaliation provision protects an individual from not from all retaliation, but from retaliation

that produces an injury or harm." *Id.* at 67.

   Plaintiff Chapman's Title VII claims based on her managers' requirements that she attend

work-related meetings in person, other work-related travel requirements placed on her, the denial

of office supplies, negative performance evaluations and appraisals, informal disciplinary actions

and warnings, denial of training opportunities and developmental work assignments, and

reassignment to new supervisors fail because Chapman has failed to show that these actions had

a significant detrimental effect on her or her employment status or were otherwise materially

adverse. None of these actions altered the terms or benefits of Chapman's employment, and,

therefore, none can satisfy the adverse employment action element of a Title VII discrimination

claim. Further, none of these actions can satisfy the adverse action element of a Title VII

retaliation claim because none was so detrimental that a reasonable employee would have been

dissuaded from reporting discrimination as a result. Thus, Chapman fails to support the adverse

action element of either a discrimination or retaliation claim under Title VII.

### (a) Reassignment to Different Supervisors

Chapman complains of her reassignment to remotely located supervisors—to Richmond-

based Tyrone Hicks in June 2008 and to Wheaton-based Donna Helm in February 2009—but

neither reassignment required Chapman to relocate or imposed any significant change on her

work. She continued to work out of the Bailey's Crossroads POD and was not required to travel

out of the area for her regular work assignments.

The Court is not persuaded by Chapman's argument that these reassignments were, in

effect, demotions due to the lack of developmental CIC work that Hicks and Helm had in her

area that could have been assigned to her and made her a better qualified for promotions. Pl.'s

Opp'n. at 9. The evidence in the record demonstrates that the availability of CIC work was

generally limited, the assignment of CIC work was based on employees' experience and

availability, and there were limited opportunities to assign CIC work to particular employees

given preexisting workloads and the need to assign higher-priority work. *See, e.g.*, Def.'s Ex. 16

at 392 (in response to Chapman's complaint that she was denied CIC work in late 2007,

Guastello declared that Chapman's workload, including preexisting and high-priority

assignments, did not permit additional assignments during that time); Def.'s Ex. 21 at 466 (in

response to Chapman's complaint that she was denied CIC work in April 2009, Helm declared

that she only had two CICs assigned to her group and that they were fully staffed). Indeed,

Chapman's previous Bailey's Crossroads-based supervisor, Richard Guastello, did not have CIC

work that could have been assigned to Chapman prior to her reassignment to Hicks. Def.'s Ex. 16 at 392; Def.'s Ex. 20 at 457. Chapman has failed to point to any evidence in the record that suggests that CIC work would have been available to her and assigned to her had she not been reassigned or had she been reassigned to a different supervisor.

The Service's alleged failure to provide her with training opportunities and developmental work assignments that did not exist cannot constitute an adverse employment action actionable under Title VII. Chapman's "[s]peculations about the impact of reassignment on [her] opportunities for professional development are . . . not sufficient to survive summary judgment." *James*, 368 F.3d at 377. Additionally, Chapman's speculations about how she would have performed on particular work assignments and these assignments would have had on management selection decisions for promotions she sought within the service are not sufficient to survive summary judgment. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002) (rejecting employee's argument that denial of certain training opportunities prevented him from being promoted as "sheer speculation"). Such speculations do not create genuine factual disputes sufficient to overcome the Secretary's well-supported motion for summary judgment. *See Anderson*, 477 U.S. at 248 (genuine issue requires evidence that would allow reasonable jury to return verdict in non-movant's favor).

Chapman also complains that her remotely located supervisors required her to attend in-person meetings with them, arguing that these meetings were unnecessary and could have been handled over the phone. These meetings were not so frequently held and did not require Chapman to travel so far as to constitute any significant change in working conditions. *See, e.g.*, Def.'s Ex. 20 at 452 (Hicks declaring that Chapman had been required to attend meetings in Richmond on only two occasions during the time he was her supervisor and that Richmond was

less than a two-hour drive from Chapman's home). Any additional stress caused by the distance

Chapman was required to travel in order to attend meetings with her supervisors was modest at

best and did not constitute the sort of harm indicative of an adverse employment action. *See*

*Holland*, 487 F.3d at 219 ("reassignment to a new position commensurate with one's salary level

does not constitute an adverse employment action even if the new job does cause some modest

stress not present in the old position"); *James*, 368 F.3d at 376 ("The mere fact that a new job

assignment is less appealing to the employee . . . does not constitute adverse employment

action."). The Court declines to intervene in legitimate management decisions like requirements

that employees attend work-related conferences in person. Such decisions do not constitute

adverse actions under Title VII when they do not materially harm the employee or her

employment status or would not dissuade a reasonable employee from reporting discrimination.

   Even if Chapman's reassignments to Hicks and Helm constituted adverse actions, the

evidence before the Court reflects the Service's legitimate non-discriminatory and non-

retaliatory reasons for these reassignments. Her reassignment from Guastello to Hicks in June

2008 was prompted by the troubled working relationship between Chapman and Guastello.

Def.'s Ex. 22 at 483. Dry has testified that the decision to reassign Chapman to Hicks was based

on his opinion that Hicks had strong interpersonal skills, which would allow Chapman to have a

"fresh start" after her difficult experience with Guastello. *Id.*; Def.'s Ex. 15 at 234. Similarly,

Dry decided to reassign Chapman from Hicks to Helm in February 2009 when Chapman alleged

sexual harassment by Hicks. *Id.* at 236; Def.'s Ex. 22 at 487. Chapman has failed to offer any

evidence that these legitimate reasons for her reassignment to new supervisors in each instance

were a pretext for sex discrimination or retaliation by Dry.

Thus, Chapman fails to meet her burden of making out a *prima facie* case of employment

discrimination or retaliation based on her reassignments to Hicks and Helm because these

management decisions were not adverse actions under Title VII. See *Coleman*, 626 F.3d at 190

(adverse employment action required for *prima facie* case of discrimination under Title VII);

*Holland*, 487 F.3d at 218 (adverse action required for *prima facie* case of retaliation under Title

VII). Even if she presented such a *prima facie* case, she fails to offer any evidence showing the

legitimate reasons justifying these reassignments to be a pretext for discrimination or retaliation.

*See Reeves*, 530 U.S. at 143 (defendant's articulation of non-discriminatory reasons for adverse

action shifts burden to plaintiff to show pretext). Similarly, Chapman fails to present *prima facie*

Title VII cases based on her managers' failure to provide certain types of work assignments and

requirements that she attend certain conferences in person because these are not adverse

employment actions. To hold otherwise would constitute nothing less than judicial meddling into

the everyday decisions of workplace managers, which was not Congress' intent in enacting Title

VII and is not a proper role for this Court. The Secretary is entitled to judgment as a matter of

law as to these claims.

### (b) Counseling Memoranda and Warnings

Additionally, Chapman complains of discrimination and retaliation in non-disciplinary

actions taken by her managers in response to her misconduct, including counseling memoranda

she received in response to inappropriate emails she sent to Guastello in June 2008 and after

walking out of a meeting with Helm without permission in March 2009. *See* Def.'s Ex. 40; Pl.'s

Ex. E at 1-2. Unlike the formal disciplinary measures taken against her, like the letter of

reprimand she received for walking out of the March 2009 meeting, the counseling memoranda

were not taken into consideration when the Service decided to terminate Chapman's

employment. The counseling memoranda were nothing more than warnings to Chapman about her misconduct. These warnings had no effect on the terms and conditions of Chapman's employment, would not have dissuaded a reasonable employee from reporting employment discrimination, and therefore could not support a Title VII claim for sex discrimination or retaliation.

Even if these warnings did constitute adverse actions under Title VII, evidence before the Court establishes the Service's legitimate non-discriminatory reasons for issuing them. By sending rude emails to one supervisor and abruptly walking out of a meeting with another, Chapman had engaged in inappropriate and unprofessional conduct that warranted a response from management, and counseling against this misconduct was a reasonable response. Chapman has failed to set any evidence before the Court showing her managers' reasons for issuing counseling memoranda in these situations to be a pretext for discrimination or retaliation. *See Reeves*, 530 U.S. at 143 (defendant's articulation of non-discriminatory reasons for adverse action shifts burden to plaintiff to show pretext). Thus, Chapman's Title VII claims based on the counseling memoranda cannot survive the Secretary's motion for summary judgment.

### (c) Performance Appraisals

Chapman also alleges discrimination and retaliation in her annual performance appraisals of 2007, 2008, and 2009, arguing that these appraisals were "not as high as [they] should have been," were not fully reflective of her job performance, and negatively affected her prospects for a promotion within the IRS. Am. Compl. ¶¶ 13, 34-36, 73, 75, 76. On each of these appraisals, Chapman received a high CJE score, all higher than her score in 2006, and was provided with a rating of "exceeds fully successful." Def.'s Ex. 89. Chapman's 2008 score was the second highest score Guastello gave any employee in 2007 or 2008 and a higher score than five of the

six males in Chapman's team. Def.'s Ex. 90. Such high job performance appraisals cannot be reasonably considered adverse. Indeed, the Fourth Circuit has held, in a discrimination context, that even *negative* job performance evaluations do not constitute adverse action unless they are "use[d] as a basis to detrimentally alter the terms or conditions of the recipient's employment." *James*, 368 F.3d at 377. Without sufficient evidence, Chapman's conclusions that her *positive* appraisals harmed her career prospects are purely speculative and not entitled to any presumption of truth. The Court declines to second guess the comprehensiveness of her supervisors' review of her work in completing such positive evaluations. Chapman had and took advantage of opportunities to rebut her supervisors' findings and conclusions and thereby mitigate any harm she feared these appraisals would do to her applications for promotions. Pl.'s Ex. B. There is no evidence before the Court that these positive appraisals negatively affected the terms or conditions of Chapman's employment, and no reasonable employee would have been dissuaded from reporting employment discrimination by such positive appraisals. Thus, the appraisals do not constitute adverse actions and cannot serve as the basis for Chapman's Title VII discrimination or retaliation claims. The Court holds that the Secretary is entitled to judgment as a matter of law as to Chapman's claims based on her performance appraisals.

### (d) Remaining Miscellaneous Complaints

Similarly, the miscellaneous grievances that remain in this case fail to rise to the level of adverse action under Title VII and may therefore be dismissed upon the Secretary's Motion for Summary Judgment. These various complaints include management's failure to provide agendas or apprise Chapman of the subject matter of work-related meetings, failure to provide Chapman with office supplies, failure to approve a disputed travel voucher, failure to do the unprecedented in providing Chapman with a rental car for travel to worksites, failure to respond to Chapman's

various complaints, *et cetera*. None of these actions negatively affected the terms or conditions of Chapman's employment, and none were so detrimental that they would have dissuaded a reasonable employee from reporting genuine workplace discrimination. Thus, none of these actions were adverse within the meaning of Title VII, and none can support a cause of action under Title VII. Accordingly, the Court holds that the Secretary is entitled to judgment as a matter of law as to Chapman's Title VII claims based upon these various management actions.

The record before the Court reflects Chapman's general practice of attributing the aspects of her work, interactions with her supervisors, and decisions made by managers that bothered or upset her to retaliation for ongoing and prior EEO activities. This practice had the effect of converting virtually every complaint she expressed to managers and unresolved disputes she had with managers into the subject matter of an EEO complaint and thus removed these unresolved workplace issues from the realm of matters that could be discussed with managers in the normal course of business. The conversion of unresolved workplace issues into EEO matters caused Chapman to resist conferences with managers about these issues, which otherwise would appear to be the legitimate topic of meetings between employees and their managers, and thus placed greater strain on what was already strained communication between her and her managers. *See, e.g.*, Pl.'s Ex. F at 196-207 (Helm attempting to schedule meeting to discuss work-related travel and Chapman rudely arguing that this was a potential EEO matter and not a proper topic of discussion). These miscellaneous grievances are not based on adverse employment actions under Title VII. Therefore, the Secretary's well-supported Motion for Summary Judgment is granted.

## IV.    CONCLUSION

The Court holds that: (1) the Secretary is entitled to judgment on the pleadings as to Plaintiff Chapman's Title VII discrimination and retaliation claims based upon the management actions alleged in Paragraphs 57, 61, 65, 66, 70, 104, and 107 of the Amended Complaint; and (2) the Secretary is entitled to summary judgment as to all of Chapman's remaining Title VII discrimination and retaliation claims. First, the Amended Complaint does not contain sufficient factual allegations to state claims under Title VII based on the non-selections alleged in Paragraphs 65, 66, and 104 and management's failure to respond to Chapman's complaints as alleged in Paragraphs 57, 61, 70, and 107.

Second, the Secretary has demonstrated that no genuine issue of material fact remains in this case and is therefore entitled to summary judgment. Chapman failed to exhaust at the administrative level two of the claims asserted her Amended Complaint, and these claims are therefore dismissed. Without direct evidence of management's discriminatory or retaliatory motives, Chapman carries the burden of presenting *prima facie* cases of Title VII sex discrimination or retaliation, and she fails to meet this burden with respect to the majority of the claims set forth in the Amended Complaint. Where she meets her burden of setting forth *prima facie* cases based on non-selection for positions filled by male applicants and her ultimate removal from the IRS, the Secretary meets his burden of articulating legitimate, non-discriminatory and non-retaliatory reasons for these management decisions. In response, Chapman fails to meet her burden of presenting evidence showing the Service's legitimate reasons to be a pretext for discrimination or retaliation. In short, other applicants were selected over Chapman because they were better qualified for the positions at issue, and Chapman was disciplined and eventually terminated for multiple instances of rude and unprofessional behavior

toward her supervisors. There is no evidence before the Court that these legitimate reasons for the adverse actions taken against Chapman were pretextual.

Accordingly, the Court grants the Secretary's Motion for Judgment on the Pleadings and Motion for Summary Judgment.

The Clerk is directed to forward a copy of this Memorandum Opinion to Plaintiff and to counsel of record.

ENTERED this 30 day of April, 2012.


Alexandria, Virginia

4 / 30/ 12

_____/s/_____
Gerald Bruce Lee
United States District Judge